UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| STEVEN CARROLL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:12-CV-324 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On September 28, 2007, plaintiff Steven Carroll filed applications for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of January 1, 2007. (Tr. 148-54; 155-57). After plaintiff's applications were denied on initial consideration (Tr. 77-82; 59-61), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 83).

Plaintiff and counsel appeared for a hearing on December 8, 2009. (Tr. 17-58). The ALJ issued a decision denying plaintiff's applications on January 8, 2010 (Tr. 65-72), and the Appeals Council denied plaintiff's request for review on January 20, 2012. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Disability Application Documents

In his Disability Report (Tr. 210-19), plaintiff listed his disabling conditions as epilepsy, a learning disability, and bipolar disorder. In the past, plaintiff worked as a cashier and cook at a restaurant, a janitor at a retail store, a paper hanger at a fast food restaurant, and a porter at the airport. He stated that he ceased working because he felt too much stress and frustration. Plaintiff reported taking Citalopram, Clonazepam, Lorazepam, and Tegretol as mood stabilizers, Dilantin for his seizures, Promethazine for nausea and vomiting, and Loperamide as a stool loosener.

In his Function Report (Tr. 192-99), plaintiff stated that he liveD in a group home with friends. On an average day, he takes medicine, sleeps, watches television, and smokes. He does not have any problems with personal care, and does chores such as cleaning, laundry, mowing the lawn, and vacuuming without help or encouragement. He goes outside frequently, walking or riding a bicycle, but he is unable to drive because of his seizure disorder. He stated that he has difficulty concentrating when there is noise, and he has trouble understanding and following instructions. He also said that he cannot pay attention for very long. Finally, he stated that he gets along with authority figures, but does not handle stress well.

Plaintiff's case manager, Sara Bobbitt, submitted a third-party function report on behalf of the plaintiff. She stated that she has known plaintiff for two months, and speaks with him at least once every week. She stated that plaintiff's bipolar disorder interferes with his socializing, and that his learning disorder interferes with his comprehension and concentration. She wrote that, because of plaintiff's condition, plaintiff "cannot hold employment." (Tr. 179-87).

### B. Hearing on December 8, 2009

Plaintiff was 33 years old at the time of the hearing, and lived at a rescue mission in Youngstown, Ohio. He moved into the rescue mission after he and his wife

separated. Plaintiff confirmed that he has a high school education, and that he had been a student in special education classes. After high school, plaintiff took a full-time job. Plaintiff described his duties as a porter for the Marriott at Lambert Airport in St. Louis as stocking food and alcohol, taking out the trash, and washing dishes. He stated that he also cooked at a Chili's Restaurant in the airport. Plaintiff later worked at Burger King, a restaurant called Ricardo's, and McDonald's. Plaintiff testified that his job at McDonald's ended due to absenteeism; when he and his wife separated, he no longer had the means to get to work.

Plaintiff stated that his anger management issues and his learning disability prevent him from working. He said that, at work, he was afraid that he would "fly off the handle" and get into a fight. In the past, plaintiff had a fight with his roommate and had physical altercations with his wife. He also contemplated physically attacking his supervisors, although he never did so. Plaintiff explained that his learning disability began when he was a child, and his seizures began at the age of 16. He testified that he typically has grand mal seizures in his sleep. When he wakes up, he experiences a headache, confusion, and soreness in his muscles and his tongue. Plaintiff stated that his seizures typically occur when his medication levels are low. The last seizure plaintiff experienced before the date of the hearing was in October 2009. Plaintiff explained that, because of his seizures, he cannot drive, operate machinery, or do any heavy lifting. Because of his learning disability, plaintiff struggles to follow instructions, and often requires a demonstration. Plaintiff testified that his medications work well, although they make him feel tired and weak.

On a typical weekday morning, plaintiff eats breakfast, and goes to class at the learning center in his group home. In the afternoon, plaintiff goes to bible class and chapel. After dinner, plaintiff attends devotions. On weekends, plaintiff exercises and

attends church. Plaintiff stated that in his free time he enjoys assembling model cars, helicopters, and airplanes, and reading exercise books, newspapers, and magazines. (Tr. 19-52).

Karen Krull, M.Ed. Rehabilitation Counseling, testified as a vocational expert. The ALJ asked Ms. Krull about the employment opportunities for a hypothetical individual with plaintiff's education, age, and work experience, who reads at a ninth grade level, writes at a seventh grade level, and performs at a third grade level in math. The ALJ added that this individual should not drive motorized equipment, work at unprotected heights, work around open and dangerous machinery, or work in hot environments; moreover, the individual must be restricted to simple instructions and tasks, cannot work with the public, and can have only occasional contact with supervisors and coworkers. However, there must be a supervisor on site to answer questions. Ms. Krull responded that such an individual could work as a porter and dishwasher, jobs that plaintiff performed in the past. (Tr. 53-56).

### C. <u>Records</u>

School records show that plaintiff was functioning below grade and age expectancy in the first grade, and that plaintiff continued to function in the low average range of intelligence throughout primary school. (Tr. 346; 299; 282; 283-84). In May of 1985, plaintiff was tested using the Wechsler Intelligence Scale for Children, and received the following scores: a verbal IQ of 85, a performance IQ of 86, and a full-scale IQ of 84. (Tr. 301). In 1993, when plaintiff was in the 11th grade, he had a verbal IQ of 77, a quantitative IQ of 66, an abstract/visual reasoning IQ of 66, a short term memory IQ of 75, and a test composite score of 67 as measured by the Stanford-Binet Intelligence Scale. These scores indicated that plaintiff was functioning within the mentally retarded range. The examiner believed plaintiff's poor behavior

and cooperation during the test contributed to those scores, and that the scores did not reflect plaintiff's abilities but rather the degree to which his behavior interfered with those abilities. Additional formal assessment showed that plaintiff's math skills were at a 4th grade level, and that plaintiff was reading at a 10th grade level and writing at a 7th grade level. (Tr. 271-78).

School records dated in 1994, from the Special School District of St. Louis County, describe plaintiff's difficulties with following directions, concentrating, and social interaction. (Tr. 252). After placement at the Applied Tech Commercial Cleaning Satellite Program at Lambert Airport, the School District noted that: "Steven has proven that he is ready for full-time employment and will graduate on June 8, 1994." (Tr. 265).

On March 3, 2004, plaintiff saw Carlos M. Yu, II, M.D. for evaluation of his seizures. Dr. Yu stated that plaintiff has a generalized seizure disorder, and prescribed 450 mg of Dilantin per day. (Tr. 428). On March 16, 2004, plaintiff was admitted to the hospital with seizures. An MRI of the plaintiff's brain was unremarkable, and the EEG was normal but showed drowsiness. (Tr. 384-85). Plaintiff attended a follow-up appointment with Dr. Yu on July 9, 2004. Plaintiff's phenytoin[1] levels were abnormally low at 9.2, on a reference range of 10 to 20. (Tr. 427; 435). Plaintiff continued to see Dr. Yu for periodic therapeutic drug monitoring. On July 17, 2004, plaintiff's phenytoin level was within range at 16.7; on September 2, 2004, it dropped to 11.8 (Tr. 433-34).

---

[1] Phenytoin is a commonly used anticonvulsant, used to treat seizures. Plaintiff takes Dilantin, a brand name of phenytoin. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011722/?report=details (last visited Jan. 23, 2013).

Plaintiff went to the emergency room at Christian Hospital on January 28, 2005 after having a seizure. Hospital records show that plaintiff bit his tongue during the seizure. Plaintiff's phenytoin level was low at 6.7. (Tr. 390-91). On March 2, 2005, plaintiff's phenytoin level had increased to 11.8. (Tr. 432). Plaintiff returned to Dr. Yu on September 6, 2005. Dr. Yu's notes indicate that plaintiff had had two seizures and his Dilantin levels were increased to 500 mg/day. (Tr. 420). On October 3, 2006, plaintiff's phenytoin was low at 9.7. (Tr. 430).

Plaintiff was admitted to St. Alexius Hospital on August 11, 2007 for agitation after an argument with his roommate. He was seen by Suren Chaganti, M.D., Sofia Grewal, M.D., and Baolin Fan, M.D. Discharge papers state that plaintiff was diagnosed with bipolar affective disorder, seizure disorder, and chronic mental illness in relapse. Plaintiff's Axis V GAF score was recorded as 20 and 30. (Tr. 444; 457).

On September 4, 2007, plaintiff visited Singh Medical Specialists. His chief complaint was listed as "unable to care for self." He was diagnosed with seizure disorder and bipolar disorder. (Tr. 461-62). On September 11, 2007, plaintiff's phenytoin level was low at 9.8. (Tr. 471). Plaintiff met with Dr. Chaganti for a follow-up psychiatric evaluation on September 27, 2007. The doctor noted that plaintiff was cooperative and relaxed, with clear speech, composed affect, average intellect, and some difficulty with recent memories. Dr. Chaganti recorded his clinical impression that plaintiff was mildly mentally ill. He increased plaintiff's Tegretol dosage. (Tr. 467).

On January 8, 2008, Judith McGee, Ph.D., completed a psychiatric review technique form. (Tr. 482-93). Dr. McGee noted that plaintiff suffered from bipolar disorder, but his restrictions on activities of daily living and difficulties in maintaining social functioning were mild. She indicated that plaintiff has moderate difficulties

maintaining concentration, persistence, and pace. Plaintiff did not have any marked or extreme degrees of limitation. Dr. McGee noted records that suggest plaintiff has difficulty understanding questions asked of him, and requires clarification. Dr. McGee concluded that plaintiff was capable of following one- to two-step instructions. (Tr. 490-92).

Dr. McGee also completed a mental RFC assessment on January 8, 2008. She found that plaintiff had no marked limitations, but moderate limitations in the following: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 494-96).

Throughout 2008, plaintiff continued to see Dr. Chaganti for follow-up psychiatric evaluations. On March 28, 2008, Dr. Chaganti noted no change in plaintiff's condition. Plaintiff was doing well, his mood was stable, and he was working at Ricardo's restaurant. (Tr. 616). No significant changes were observed on April 17, 2008. (Tr. 615). On May 2, 2008 plaintiff went to St. Alexius Hospital Emergency Room with pain in his chest. He was discharged that day. (Tr. 512-13). Again, no significant changes were observed during additional follow-up appointments with Dr. Chaganti on May 17, June 5, July 24, August 22, October 2, and November 4, 2008. Plaintiff was found to be mildly or moderately mentally ill, with little change in severity. (Tr. 609-14). Plaintiff visited the Forum Health Center on March 23, 2009 for seizure medication. (Tr. 535).

At a diagnostic assessment at the Turning Point clinic on June 30, 2009, plaintiff stated that he had been violent towards his wife. He reported that his last seizure

occurred in February 2007. (Tr. 559). He had a GAF of 55. (Tr. 569). Plaintiff continued to see counselors and nurses at Turning Point during 2009, and worked on controlling his anger. Records show visits on July 31, August 20 and 21, and September 11 and 17, 2009. (Tr. 546-57).

On July 11, 2009, plaintiff visited St. Elizabeth's Health Center with back complaints. He was diagnosed with a strained back, mild degenerative changes at L5-S1, and seizures. (Tr. 602-03). He attended a follow-up appointment at the hospital on July 15. (Tr. 606). On October 18, 2009, plaintiff went to the emergency room at St. Elizabeth's, after having a seizure during the night. Plaintiff stated that he had not taken all of his Dilantin or Tegretol the day before because he ran out of the medications. Plaintiff's phenytoin was very low at 1.8. (Tr. 577-88).

### III. The ALJ's Decision

In the decision issued on January 8, 2010, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2010.

2. Plaintiff has not engaged in substantial gainful activity since January 1, 2007, the alleged onset date.

3. Plaintiff has the following severe impairments: seizure disorder, learning disability, mood disorder, and personality disorder.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the plaintiff should have no exposure to occupational hazards such as unprotected heights, dangerous moving machinery, or occupational driving; the plaintiff should have no exposure to extremes of heat; the plaintiff is limited to simple tasks; the plaintiff should have ready access to a supervisor for additional instructions or directions, no more than occasional contact with coworkers, and no contact with members of the general public.

6. Plaintiff is capable of performing past relevant work as a porter and dishwasher. This work does not require the performance of work-related activities precluded by the plaintiff's residual functional capacity.

7. Plaintiff has not been under a disability, as defined by the Social Security Act, from January 1, 2007 through the date of this decision.

(Tr. 67-72).

## IV. Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step

in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and

citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ's RFC determination is not supported by "some" medical evidence. Plaintiff also claims that the hypothetical question posed to the

vocational expert did not capture the concrete consequences of plaintiff's impairment, and therefore the response of the expert does not constitute substantial evidence. Finally, plaintiff argues that the ALJ erred by not including a function-by-function analysis of his past relevant work.

### 1. Residual Functional Capacity

The ALJ determined that plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the plaintiff should have no exposure to occupational hazards such as unprotected heights, dangerous moving machinery, or occupational driving; the plaintiff should have no exposure to extremes of heat; the plaintiff is limited to simple tasks; the plaintiff should have ready access to a supervisor for additional instructions or directions, no more than occasional contact with coworkers, and no contact with members of the general public.

The RFC should be based upon all relevant evidence in the record. Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) ("The ALJ should determine a claimant's RFC based on all relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."). The RFC must be supported by some medical evidence. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Each limitation the ALJ included in the RFC is directly supported by medical evidence in the record. After considering the medical evidence related to plaintiff's alleged seizure disorder, the ALJ noted that plaintiff had not received any diagnostic tests for a seizure disorder since the alleged onset date. The EEG and MRI performed on plaintiff in 2004 were both normal. The instances of seizures in the record all occurred in plaintiff's sleep, and they more frequently occurred when plaintiff's

medications were at a sub-therapeutic level, or when plaintiff ran out of medication completely. Because of the medical evidence showing a history of occasional seizures, the ALJ specified that plaintiff should not be exposed to hazards like heights or heavy machinery, and should not drive. The evidence does not suggest that any greater restrictions would be required by plaintiff's seizures.

The ALJ also reviewed the medical evidence regarding plaintiff's learning disability, which shows that plaintiff's IQ falls within the low-average range of intellectual functioning. Dr. McGee's evaluations confirm that, while plaintiff has difficulty with complex instructions or tasks, he is capable of completing simple tasks. Therefore, the ALJ limited plaintiff to simple tasks, with access to supervisors. Finally, the ALJ considered plaintiff's bipolar disorder. The ALJ emphasized that during a particularly stressful time for the plaintiff, his GAF score was measured at 55, indicative of only moderate symptoms. Furthermore, plaintiff was only admitted to the hospital once for physically aggressive behavior towards his roommate in 2007. Dr. McGee again confirms that plaintiff has only moderate limitations getting along with coworkers, peers, or supervisors. Because of this evidence, the ALJ determined that plaintiff should have no more than occasional contact with coworkers and no contact with the general public. Again, the record supports this degree of limitation.

Plaintiff further argues that the ALJ placed improper weight upon Dr. McGee's mental RFC evaluation and psychiatric review technique form. Plaintiff points out that a non-examining source does not constitute substantial evidence. A non-examining consultant's opinion alone is insufficient to support an ALJ's RFC determination, and certainly falls short when contradicted by the opinion of a treating physician. See Jenkins v. Apfel, 196 F.3d 922, 924-25 (8th Cir. 1999). However, the ALJ did not rely *solely* upon Dr. McGee's assessment in determining the RFC. As described above, the

ALJ based the RFC upon medical records from treating and examining sources, plaintiff's testimony, and the record as a whole. Furthermore, the ALJ specified that he gave great weight to Dr. McGee's analysis because it was consistent with the other evidence in the record, and because the record failed to disclose any opinion from a medical source that plaintiff's condition is disabling.

Plaintiff also suggests that the ALJ improperly failed to incorporate the restrictions described by Dr. McGee into the RFC. Dr. McGee stated that plaintiff has only moderately limited concentration, pace, and ability to get along with coworkers, and that plaintiff can follow one or two step instructions. She also indicated that plaintiff's abilities to sustain an ordinary routine without special supervision and carry out short and simple instructions are not significantly limited. The ALJ's RFC specifically provides that plaintiff should be limited to simple tasks, have access to supervisors to ask questions, and have limited contact with coworkers. To the extent that the ALJ's RFC deviates from Dr. McGee's opinion, plaintiff himself acknowledges that the ALJ was not required to arrive at the exact same conclusion as Dr. McGee, a non-examining source.

In conclusion, the RFC at which the ALJ arrived is supported by medical evidence, and by the record as a whole. The weight given to the opinion of non-examining Dr. McGee was not improper. The Court finds no error in the ALJ's RFC determination.

### 2. The Hypothetical Question Posed to the Vocational Expert

Plaintiff next contests the legal sufficiency of the ALJ's hypothetical question. Plaintiff argues that the question did not "capture the concrete consequences" of plaintiff's impairment, because the hypothetical did not limit plaintiff to one or two step tasks, nor did it address plaintiff's alleged difficulties with concentration or with exhibiting behavioral extremes towards coworkers. However, a hypothetical need only include the impairments and limitations found credible and accepted as true by the

ALJ.  See Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir. 1997) (citing Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985)) ("To constitute substantial evidence, a hypothetical must set forth the impairments accepted as true by the ALJ."). Additionally, at this stage in the sequential evaluation process, plaintiff bore the burden to establish that he could not return to past relevant work.  E.g., Dukes, 436 F.3d at 928.

In this case, the ALJ's hypothetical is consistent with the RFC and the ALJ's determinations regarding plaintiff's credibility and the severity of plaintiff's limitations. To the extent that the ALJ chose not to adopt certain details verbatim from the report of the consultative non-examining Dr. McGee (that plaintiff can only follow one to two step instructions, has difficult concentrating, and cannot get along with coworkers without exhibiting behavioral extremes), the ALJ was under no obligation to agree with every detail of an opinion from a non-examining source.

While the ALJ did not adopt the one- to two-step instruction limit, he did specify that plaintiff should be restricted to simple instructions and have ready access to a supervisor for additional instructions and directions. Unlike the one- to two-step" limit, which appears only in Dr. McGee's report, the need for additional guidance when following instructions is amply supported by plaintiff's school records and plaintiff's own testimony. The ALJ also omitted any reference to plaintiff's difficulties with concentration. However, he did provide that plaintiff should be restricted to simple instructions and tasks, and should have access to a supervisor for follow-up questions. This record shows that plaintiff can concentrate on simple tasks (for example, he reported that his first job as a janitor was "pretty easy" because he only had to clean), and that the guarantee of assistance and clarification helps plaintiff complete the tasks he begins. Therefore, the ALJ's hypothetical captures plaintiff's particular difficulties

with concentration. See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 1997) (holding that a hypothetical limiting plaintiff to simple, repetitive, routine tasks accurately captures that particular plaintiff's deficiencies in concentration, persistence, or pace). Finally, the ALJ did account for concrete consequences of plaintiff's exhibition of behavioral extremes by restricting plaintiff's contact with co-workers and the public. This degree of restriction is supported by the record.

### 3. Past Relevant Work

Plaintiff argues that the ALJ did not go through a function-by-function analysis of his past relevant work, and did not make explicit findings concerning the mental demands of that past work as required by Social Security Ruling 82-62 and by the Eighth Circuit. Plaintiff suggests that the ALJ's decision that he can return to past relevant work was conclusory and was not fully developed and explained as required by Pfitzner v. Apfel, 169 F.3d 566 (8th Cir. 1999).

The Social Security Administration has stated that "[t]he decision as to whether the claimant retains the functional capacity to perform past work… must be developed and explained fully in the disability decision." SSR 82-62, 1982 WL 31386, at * 3. Specifically, the Eighth Circuit has explained that an ALJ should

> make explicit findings regarding the actual physical and mental demands of the claimant's past work. Then, the ALJ should compare the claimant's residual functional capacity with the actual demands of the past work to determine whether the claimant is capable of performing the relevant tasks. A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to his past work.

Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir. 1991). See also Pfitzner, 169 F.3d at 568-69; Ingram v. Chater, 107 F.3d 598, 604 (8th Cir. 1997).

Alternatively, the ALJ may satisfy this duty by expressly referring to specific job descriptions in the Dictionary of Occupational Titles, or by relying on a vocational

expert. James v. Astrue, 4:07-CV-1382-HEA, 2008 WL 4204712, at *10 (E.D. Mo. Sept. 8, 2008) (internal citations omitted). In this case, although the burden had not yet shifted to the Commissioner, the ALJ solicited testimony from a vocational expert as permitted by 20 C.F.R. §404.1560(b)(2). The expert explained that the work of a porter and a dishwasher is medium and unskilled, and that given plaintiff's RFC he would be able to perform this work. She further affirmed that her testimony was consistent with the Dictionary of Occupational Titles. (Tr. 54-56). This constitutes substantial evidence that the claimant can perform past work. See Ramirez v. Astrue, 06-5126-CV-SW-W-SSA, 2008 WL 880167, at *3 (W.D. Mo. Mar. 28, 2008) (rejecting plaintiff's argument that the ALJ erred in failing to make specific findings regarding the physical and mental demands of plaintiff's past relevant work, when the ALJ relied upon a vocational expert). The ALJ justifiably relied upon the expert's testimony in concluding that plaintiff's RFC would not preclude performance of plaintiff's past relevant work as a porter and dishwasher "both as the claimant actually perform[s] such work and as such work is generally performed in the national economy." (Tr. 72). Failure to elaborate on the demands of that past relevant work is not reversible error. Ramirez, 2008 WL 880167, at *3; see also Battles v. Sullivan, 902 F.2d 657, 659 (8th Cir. 1990) (if record contains substantial evidence that claimant can perform past work, failure to develop past work record in full detail does not require remand).

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [#14] is **denied**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 29th day of January, 2013.